Filed 11/15/13  Geller v. Consultants for Pathology CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVEN GELLER, | B238213 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BS131568) |
| CONSULTANTS FOR PATHOLOGY AND LABORATORY MEDICINE, A MEDICAL GROUP, INC., | |
| Defendant and Appellant; | |
| STEVEN GELLER, | B239293 |
| Plaintiff and Appellant, | |
| v. | |
| CONSULTANTS FOR PATHOLOGY AND LABORATORY MEDICINE, A MEDICAL GROUP, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed in part, reversed in part, and remanded.

Sheppard, Mullin, Richter & Hampton, James M. Burgess, Karin Dougan Vogel and Jay Ramsey for Defendant and Appellant and Defendant and Respondent.

Connolly & Finkel and Alan H. Finkel for Plaintiff and Respondent and Plaintiff and Appellant.

_____

Dr. Stephen Geller, a shareholder of Consultants for Pathology and Laboratory Medicine, a Medical Group, Inc. (CPLM), requested shareholder and financial records of CPLM, pursuant to Corporations Code sections 1600[1] and 1601,[2] which allow shareholders to inspect such documents. When Geller and CPLM could not agree to terms of a confidentiality and non-disclosure agreement, Geller filed a petition for writ of mandate to direct CPLM to comply with his inspection requests. Although Geller's writ petition was filed in April 2011, it was not heard until December 30, 2011. By the time of the hearing, CPLM had terminated Geller's employment, effective December 31, 2011, which also had the effect of terminating his status as a shareholder. CPLM therefore argued that Geller could have no legitimate purpose, related to his shareholder status, to inspect the documents, as his remaining hours of shareholder status were not sufficient for him to review the documents or pursue any legitimate shareholder goals with them. The trial court, in order not to deprive Geller of his statutory inspection rights, directed CPLM to *immediately* provide the documents to Geller.

---

[1]     Corporations Code section 1600, subdivision (a) provides, in pertinent part, "A shareholder . . . holding at least 5 percent in the aggregate of the outstanding voting shares of a corporation . . . shall have an absolute right to . . . inspect and copy the record of shareholders' names and addresses and shareholdings during usual business hours upon five business days' prior written demand upon the corporation."

[2]     Corporations Code section 1601, subdivision (a) provides, in pertinent part, "The accounting books and records and minutes of proceedings of the shareholders and the board and committees of the board of any domestic corporation . . . shall be open to inspection upon the written demand on the corporation of any shareholder . . . at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder . . . . "

CPLM and Geller then agreed that the inspection would go forward on January 6, 2012, with CPLM agreeing that it would make no argument based on Geller's shareholder status having been terminated in the interim. Prior to the scheduled inspection, however, CPLM filed a notice of appeal and petition for writ of supersedeas. We granted the writ petition, staying the effect of the trial court's order.

On appeal, CPLM argues that the trial court erred in granting Geller's writ petition when his shareholder status was on the verge of coming to a close. We hold that Geller had sufficient shareholder status to support his purpose and, in any event, CPLM should not be permitted to unilaterally terminate Geller's status to defeat his right of inspection. We conclude, on Geller's cross-appeal, that the trial court erred in reducing his award of attorney fees.

### FACTUAL AND PROCEDURAL BACKGROUND[3]

1. *CPLM and Geller*

CPLM is a corporation which provides pathology services at Cedars-Sinai Medical Center (Cedars). Being a shareholder of CPLM is tied to being an employee of CPLM; shareholder employees must sell their stock back to CPLM when they are no longer employed by CPLM. Geller originally founded CPLM, and was its original president. Geller was succeeded as president in 2006 by Dr. Mahul Amin, but remained an employee and shareholder. Geller and Amin had different management styles, and

---

[3] Our discussion of the factual and procedural background is very lengthy. This was required in order to provide a complete factual context for our decision. In addition, it was also necessary in order to explain our rejection of CPLM's argument that there are no disputed issues of fact. In fact, CPLM has mischaracterized or simply overlooked evidence supporting Geller's view of the facts.

the record reflects a certain tension between them regarding the management of the company. It also appears that Geller discussed some of his concerns regarding CPLM with non-CPLM employees of Cedars, a fact which CPLM felt was not only a breach of its confidences, but damaging to its ongoing relationship with Cedars.

2.     *Geller's Request for Inspection of Documents*

Geller was also concerned about the financial condition of CPLM, as Amin had not circulated annual financial statements to the shareholders since he had taken control of CPLM. On February 16, 2011, Geller, through counsel,[4] made a written demand on CPLM for inspection and copying of shareholder and financial information of CPLM. Geller requested 14 different categories of documents.[5] As we shall discuss, although

---

[4]     Geller's counsel was also representing two other CPLM-related individuals in making the request, at least one of whom was alleged to be a director of CPLM. Directors' inspection rights are governed by Corporations Code section 1602. The inspection rights of any individuals other than Geller, however, are not at issue in this case.

[5]     Geller requested: "1. A list of the shareholders and the ownership interest of each shareholder [¶] 2. Stock record book [¶] [3]. Minutes of meetings of the Board of Directors, shareholder meetings and committee meeting minutes, including minutes of meetings of the compensation committee from January 1, 2007 to the present [¶] 4. Copy of articles of incorporation and any amendments thereto [¶] 5. A company organization chart [¶] 6. All shareholder agreements [¶] 7. Employment contracts for all doctors and all shareholders from Jan. 1, 2007 to the present [¶] 8. Year end payroll report of compensation to all professionals for the years 2010, 2009, 2008 [¶] 9. W-2's and 1099 forms for shareholders and/or doctors for the years ending December 31, 2010, 2009, 2008. [¶] 10. Any and all schedules, computations and records that evidence the amount paid as salaries, bonus[es], distributions and or profit allocation to shareholders and/or doctors for the years 2010, 2009 and 2008. [¶] 11. Any and all documents that evidence reimbursed expenses paid to shareholders and/or doctors for the years 2010, 2009 and 2008. [¶] 12. Any and all documents that evidence any loans to shareholders and/or doctors for the years 2010, 2009 and 2008. [¶] 13. General

5

the trial court ultimately found Geller's request to be overbroad, the dispute in this case does not center around which documents Geller may inspect, but whether he may inspect any CPLM documents at all. Geller's letter explained, "The purpose of this inspection [is to] review the financial condition of CPLM based on its income and expenses and to determine the number of outstanding shares and the names and address[es] of shareholders in order to give notice of a shareholders meeting." Geller requested that the documents be made available to his CPA, for inspection and copying.

3.       *Negotiations Over a Confidentiality and Non-Disclosure Agreement*

There followed a lengthy exchange of correspondence between counsel for Geller and counsel for CPLM, regarding whether Geller would be required to execute a confidentiality and non-disclosure agreement. Because CPLM ultimately took the position that Geller's refusal to execute such an agreement provided a valid justification for its refusal to allow him to inspect the documents, it is necessary to discuss these letters at some length.

On February 24, 2011, counsel for CPLM wrote counsel for Geller, indicating that once Geller, his CPA, and his counsel executed the attached confidentiality and non-disclosure agreement, CPLM would make the statutorily-required documents available. The draft agreement provided that Geller would keep the disclosed information confidential, and would not disclose it to anyone other than his accountant and attorneys. Indeed, the document provided that Geller would keep confidential the

---

ledger for the years ended 12/31/10, 12/31/09, 12/31/08 [¶] 14. Federal and California tax returns for 2009, 2008 and 2007[.]"

*fact* that information had been provided. It further provided that, on written request of CPLM, Geller would return all documents, including copies, summaries and analyses, except those protected by the work-product privilege.

Geller was concerned that this agreement would prohibit him from sharing any information he received with other shareholders (who, under the statutes, would also be entitled to inspect the documents). CPLM's counsel confirmed by e-mail to Geller's counsel that "we do intend to limit the information solely to your . . . clients."

On March 7, 2011, Geller's counsel again rejected the confidentiality agreement. She argued that the provisions of the Corporations Code allowing shareholder inspection "would be meaningless if the shareholder were precluded from sharing the information with other shareholders."

On March 16, 2011, CPLM's counsel indicated that the documents would be available for review on March 29, but renewed his request that any representatives of Geller who would be inspecting the documents execute the confidentiality agreement. On March 18, 2011, Geller's counsel, by e-mail, indicated that Geller would not sign the agreement. On March 22, 2011, CPLM's counsel, who either did not receive, or did not recall receiving, Geller's counsel's e-mail, stated that, having received no response to his letter, he was rescheduling the inspection to April 26, 2011, and again requested that Geller's counsel confirm that the confidentiality agreement would be signed.

On March 24, 2011, Geller's counsel wrote CPLM's counsel indicating her intent that the inspection go ahead on March 29, as previously offered. As to the issue of confidentiality, she stated, "I have retained an accounting firm to evaluate the

7

financial data. I cannot be precluded from providing a written evaluation with my client or with other shareholders if requested by my clients. Since the confidentiality agreement you sent me is overbroad and is not directed only at the representatives, if you want to tailor a confidentiality agreement accordingly, I will review it." The following day, Geller's counsel wrote again, confirming that her concern was that the proposed confidentiality agreement was overbroad. She stated, "I am glad to work with you to draft language to alleviate some of your concerns but will not prohibit my clients from sharing certain information with other shareholders and directors."

On April 4, 2011, Geller's counsel again wrote CPLM's counsel, attaching her version of a proposed confidentiality agreement. Her draft provided that Geller would not disclose the information "to any person whatsoever without the prior written consent of Corporation other than disclosures to Corporation's officers, directors, shareholders, physician-employees or other authorized representatives." Counsel for CPLM responded, by e-mail, that the agreement was largely acceptable, but he had a few changes he would e-mail to counsel for Geller. It does not appear that the proposed changes were sent as promised.[6]

---

[6]     CPLM's counsel stated that he told Geller's counsel "that her changes were mostly acceptable but that I had a few changes that I had hoped to provide by the following Monday." The "following Monday" was April 11, 2011. There is no indication in the record that the changes were provided by that date.

4. *Geller's Petition for Writ of Mandate*

On April 12, 2011, Geller filed his petition for writ of mandate.[7] Geller sought a writ directing CPLM to comply with his request to inspect and copy the information he had sought in his February 16, 2011 letter. He alleged that he sought the information "to evaluate the economic conditions of CPLM and to communicate with other shareholders regarding policies of the present management of the company in view of its economic conditions." Geller alleged that CPLM had refused to comply unless Geller "agree[d] to sign a confidentiality agreement precluding him sharing the information obtained with other shareholders."

5. *Further Negotiations on the Confidentiality Agreement*

After the writ petition had been filed, counsel for CPLM sent counsel for Geller a revised version of Geller's proposed confidentiality agreement. Counsel for both parties met in person on April 15, 2011 and reached agreement on the terms of a confidentiality agreement, subject to their clients' approval. If the clients agreed, the inspection would proceed on April 19, 2011. This proposed agreement provided that

---

[7] In a later court filing, CPLM would describe the events preceding the filing of the writ petition as follows: "On February 16, 2011, Geller requested that CPLM produce for inspection 14 overly broad categories of business records under Corporations Code § 1600 *et seq.* [Citation.] CPLM promptly responded by requesting that Geller sign a confidentiality agreement. [Citation.] CPLM even provided Geller with a draft of a proposed confidentiality agreement. [Citation.] Geller refused to sign CPLM's confidentiality agreement, and did not provide any alternative language that would have been acceptable to him. [Citation.] [¶] Without further discussion, on April 12, 2011, Geller filed a petition for writ of mandate . . . . " This description is, at best, revisionist history. Not only had there been "further discussion," but Geller did, in fact, "provide . . . alternative language that would have been acceptable to him," a full week before filing his writ petition.

9

the signatory agreed to use the information solely in connection with the signatory's rights and obligations as a shareholder or director. The agreement provided that the confidential information could be disclosed to any other shareholder or director who also executed the agreement.

Geller refused to sign the agreement, for reasons which are unclear.[8] It appears, however, that the sticking point was that Geller did not want to be responsible for collecting the signatures of every shareholder and director of CPLM. CPLM's counsel subsequently offered to obtain the signatures and modify the agreement to provide that it would. At this point, though, further proceedings had begun in court; and it appears that negotiations temporarily ceased.[9]

6. *Geller's Ex Parte Application for Issuance of the Writ*

On April 20, 2011, Geller filed an ex parte application for issuance of the writ. On April 21, 2011, CPLM filed its opposition. CPLM argued that a confidentiality agreement was necessary because Geller "ha[d] already wrongly disclosed information to [Cedars]." CPLM argued that Geller "is the former Chairman of [CPLM] who improperly seeks to regain control over [CPLM] contrary to its bylaws.[[10]] Dr. Geller sent inflammatory emails to Cedars . . . which [were] intended to, and did, disrupt

---

**8** The record indicates a reason given by one of the other clients of Geller's attorney, but no reason given by Geller.

**9** There is, however, a suggestion in the record that, as late as September 2011, the parties were still attempting to negotiate a confidentiality agreement.

**10** CPLM never placed before the trial court, or this court, any of CPLM's bylaws which allegedly prohibited Geller from seeking to regain control of CPLM.

10

[CPLM's] relationship with Cedars.  Dr. Geller appears to have the attitude that if he cannot control [CPLM], then no one can.  [Geller is] pursuing [his] own interests over the interests of the corporation and other shareholders."  CPLM supported this accusation with an e-mail from CPLM's counsel to Geller's counsel, to which CPLM's counsel attached an e-mail purportedly sent by Geller to individuals at Cedars, as well as other CPLM doctors.  While we do not concern ourselves with the merits of the dispute between CPLM and Geller, we note that there is nothing in Geller's e-mail which reveals *confidential CPLM* information to the recipients, and nothing in CPLM's counsel's e-mail which accuses him of doing so.[11]

Geller's ex parte request was denied.  The court, however, set the matter for an order to show cause hearing on May 12, 2011.[12]

---

[11]  Instead, CPLM's counsel's e-mail states that Geller's e-mail was troublesome as it could potentially harm CPLM's relationship with Cedars.  CPLM's counsel states, "If Dr. Geller has concerns about CPLM, he should make such concerns known directly to the CPLM officers or directors, rather than engage in his current course of action of accusatory emails, burdensome shareholder inspection requests and interference with CPLM affairs."  We note that CPLM's counsel overstates the nature of Geller's accusations.  In Geller's e-mail, he had stated that he understood that some of his fellow CPLM members had been urged by CPLM to be " 'positive' " during an upcoming review of CPLM by Cedars.  Geller encouraged everyone simply to be honest.  He further stated, "I believe (but need to confirm) that the RICO Act mandates against intimidation prior to fact-finding efforts, such as this survey . . . . "  CPLM's e-mail states that, since Geller referred to RICO, "Dr. Geller appears to be accusing CPLM management of both intimidation and of racketeering or acting like the Mafia."  Indeed, throughout this litigation, CPLM argued that Geller's e-mail "outrageously accused CPLM's management of intimidation or Mafia-like racketeering."  It is patently clear that Geller did not "accuse[] CPLM's management of . . . Mafia-like racketeering."

[12]  The court characterized the hearing as an order to show cause on preliminary injunction.  Subsequently, a different judge recharacterized the hearing as an order to show cause why the writ should not issue.  In a subsequent filing, CPLM stated that,

11

7. *Noticed Motion for Issuance of the Writ*

As directed by the trial court, Geller filed an amended motion for issuance of the writ, and points and authorities in support thereof. Geller noted that a shareholders' meeting was now set for May 24, 2011, less than two weeks after the upcoming May 12 hearing. Geller argued that, "[i]t is now blatantly clear that CPLM's goal is to have the shareholder[s'] meeting occur before any inspection can occur or in the alternative to prevent petitioner from being able to share information regarding the financial condition of CPLM with other shareholders." Geller requested that, in light of the delay in his receipt of the information he sought, the shareholders meeting be postponed.[13]

8. *Continuance for Geller's Deposition*

CPLM continued to question whether Geller's purpose in requesting the documents was a legitimate purpose related to his interests as a shareholder.[14] It

---

after the ex parte motion was denied, "Judge O'Brien scheduled an OSC for May 12, 2011 which was later vacated by Judge Chalfant as being improper." This is a mischaracterization of the record. Judge Chalfant did not vacate the scheduled hearing on the order to show cause, but simply recharacterized it (and, as we shall discuss, continued it).

[13] Corporations Code section 1600, which provides shareholders with the right to inspect the record of shareholders' names, addresses, and shareholdings, further provides that, "[a]ny delay by the corporation . . . in complying with a demand under subdivision (a) beyond the time limits specified therein shall give the shareholder or shareholders properly making the demand a right to obtain from the superior court . . . an order postponing any shareholders' meeting previously noticed for a period equal to the period of such delay. Such right shall be in addition to any other legal or equitable remedies to which the shareholder may be entitled." (Corp. Code, § 1600, subd. (b).)

[14] CPLM now argued that Geller "has already . . . disclosed proprietary information covered by [his] employment agreement's non-disclosure provisions." The employment

12

therefore sought to take Geller's deposition prior to filing its opposition. As Geller was unavailable when CPLM sought his deposition, CPLM filed an ex parte motion to compel Geller's deposition and continue the May 12, 2011 hearing. In its motion, CPLM argued, "There is no harm in granting the continuance as there is no risk that the corporate records that are sought will be made unavailable by the passage of time." CPLM sought to continue the hearing to June 20, 2011.

Geller opposed the motion, submitting his own declaration confirming his reasons for seeking the documents. Geller stated that he sought "to determine the financial health of CPLM and analyze the income and the propriety of the expenses. My demand to inspect the books and records of CPLM was the only vehicle available to

agreement signed by Geller provides as follows: "Physician will obtain and have access to confidential information and trade secrets of Corporation, including, without limitation, Corporation's . . . physician contracts, financial statements, other financial and administrative data, and other proprietary information relating to the professional and general business management, administration, operations and finances of Corporation (collectively 'Proprietary Information') . . . ." It further provides: "Physician shall maintain the confidentiality of all Proprietary Information and shall not disclose or cause the disclosure of any Proprietary Information to any person whatsoever without the prior written consent of Corporation other than disclosures to Corporation's officers, directors, shareholders, physician-employees or other authorized representatives in connection with the performance of professional medical services and other related duties or responsibilities on behalf of Corporation. Physician shall not at any time use or otherwise exploit Proprietary Information for Physician's personal benefit or for the benefit of any other person, whether during or after the term of this Agreement." Whether Geller's communications with individuals at Cedars regarding the review of CPLM violated this provision is beyond the scope of this opinion. We simply note that CPLM has not clearly established, *as a matter of law*, that anything Geller said about CPLM to Cedars constituted "proprietary information relating to the professional and general business management, administration, operations and finances" of CPLM, nor that his disclosures to Cedars were not made to "other authorized representatives in connection with the performance of . . . other related duties or responsibilities on behalf of Corporation."

13

me to determine the financial condition of the corporation and whether the funds had been used appropriately. And I need to be free to share the findings of the accountant with other shareholders and directors." He further stated, "The claims made by CPLM's counsel that I intend to use this information to harm the corporation or that I wish to take over Amin's job are ludicrous. I have no intention of publishing the information on the internet. I have absolutely no interest in again becoming chairman and president. I did that for twenty-two (22) years. All I want to do now is to continue my study of liver diseases, and work on my own personal projects."

The trial court granted the ex parte petition. Geller's deposition was to go ahead, but it was limited in time to one hour. The trial court continued the hearing to June 20, 2011.

9. *Proceedings are Stayed to Allow for an Audit*

Geller's deposition did not immediately take place. Instead, the parties reached a stipulation to stay the action. CPLM agreed to conduct an independent audit, and provide the results of the audit to Geller.[15] The parties agreed to stay the proceedings until the audit had been completed and Geller had received and reviewed its results.[16] It was not known how long the audit would take, although the parties assumed it would

---

[15] Corporations Code section 1603 provides that, upon a corporation's refusal of a lawful demand for inspection, the court may, for good cause shown, appoint an accountant to audit the books, records, funds, and affairs of the corporation "and to report thereon in such manner as the court may direct." In this case, the parties stipulated to an audit, the results of which would be provided to Geller.

[16] CPLM also agreed to postpone the shareholders' meeting until at least 30 days after the audit report had been presented to its board or until 45 days after the judgment on the writ petition had become final.

14

take approximately 120 days. As such, the parties agreed that the matter "shall be stayed until thirty (30) days after the result of the independent audit is provided to [Geller] or November 7, 2011, whichever is sooner." On June 3, 2011, the trial court approved the stipulation and set the matter for a status conference on November 8, 2011. The hearing on the order to show cause was taken off calendar.

10. *Geller's Employment Contract is Not Renewed*

On September 20, 2011, while the matter was stayed and the audit was allegedly being conducted, CPLM informed Geller that his employment contract would not be renewed at the end of the year. Geller's agreement with CPLM provided that if a shareholder's employment is terminated, CPLM "shall purchase and such terminated Shareholder shall sell" all of the shareholder's stock, within 30 days after the termination of employment. The purchase would be at the set price of $1 per share. Thus, Geller's status as a stockholder would terminate no later than January 30, 2012.

11. *The Matter is Returned to Calendar*

The status conference was held, as scheduled, on November 8, 2011. The audit had not been completed,[17] and Geller sought to have the matter returned to calendar as

---

[17]    CPLM represented that the audit was delayed because its third-party billing company sent its data to the auditor in a form the auditor could not use. CPLM represented that it hoped the audit would be completed by mid-December, but now expected it to be completed "no later than early January." There is no evidence in the record that the audit was ever completed. In its reply brief on appeal, CPLM states that the audit was completed "in 2012" and that it "revealed no financial or other improprieties." Obviously, CPLM's characterization of the findings of the audit is not properly before us. In any event, the purpose of the stipulation was not merely for an audit to be conducted and given to CPLM's board, but for Geller to have an opportunity to reveal the audit results in lieu of reviewing the financial information he had sought.

15

soon as possible. CPLM argued that there was "no reason to back away from the parties' deal at this point, which is in the interests of all shareholders."[18]

The trial court agreed that the stay was automatically lifted, so a new trial date had to be set. Geller's counsel argued for a hearing date "as soon as possible" in light of CPLM's termination of Geller's employment. The parties were directed to agree on dates for Geller's deposition, further briefing, and the hearing. The parties agreed to dates with the hearing on the writ petition being held on December 22, 2011. The clerk informed the trial court that there were already two matters set for that date, and the court indicated that the parties would need to pick another date. CPLM's counsel immediately requested "the first available then in January." The court clerk stated that January 6 was available. Geller's counsel explained his concern to the court that Geller's contract was not renewed and he would be required to sell back his shares. He stated that "on January 6th he won't be a shareholder any longer and my concern is that [CPLM] will say on January 6th, well, he is no longer a shareholder and this is all moot. And I discussed that with counsel." The court asked what Geller's counsel wanted, and

---

[18] CPLM's argument is somewhat confusing as the parties' "deal" was that the case would be stayed until 30 days after the audit results were provided to Geller or November 7, 2011, whichever was sooner. Thus, there was no issue of Geller "back[ing] away from the parties' deal." The reporter's transcript of the status conference suggests that there was a similar stipulation in the case brought by another CPLM physician, but that stipulation did not provide that the stay would automatically be lifted on November 7, 2011. When the terms of the stipulation in the instant case regarding the termination of the stay were pointed out to CPLM's counsel at the status conference, CPLM's counsel stated, "It certainly is not the spirit of what was intended," but ultimately conceded, upon reviewing the language of the stipulation, that, "it is what it is."

16

he stated his preference would be to set the hearing in December.[19] The court responded, "Well, we can't right now. We are going to set it on January 6th. [¶] You people have had since June to agree on settling and getting an audit and all of that and you waited all this time. Now it gets down to this point with all the wasted time before, and that is just the way the cards are la[id]." Geller's counsel agreed that "it's taken an incredible amount of time for this shareholder to be allowed to review the corporation's financial records and now the corporation has decided to terminate him. And at the date of the hearing, he is not going to be a shareholder any longer. That is where we find ourselves." The court responded, "I think whatever flows from everybody's conduct or lack of conduct during the last few months I think is finally coming to r[oo]st."[20]

12.     *Geller's Deposition*

Geller's deposition was taken on November 17, 2011. In its subsequent opposition to the writ petition, CPLM characterized Geller's deposition as follows: "[Geller] was not able to state any legitimate reason for seeking the records. Indeed, his only answer was that his lawyer told him to do it." This is a mischaracterization of

---

[19]     The reporter's transcript erroneously states that counsel wanted to set the matter "in the summer." It is clear from the context that counsel stated, "in December."

[20]     In a subsequent filing, CPLM states that, when Geller's counsel sought an earlier hearing date, "The Court stated that Geller had only himself to blame and refused to alter the hearing date." CPLM also states that "For reasons that are not known, the transcript is not available for this hearing." The latter statement is clearly false; the transcript has been provided as part of the record on appeal. In any event, CPLM's characterization of the court's comments is incorrect. At no time did the court state that "Geller had only himself to blame"; the court stated that both parties were at fault for the delay.

17

Geller's deposition testimony.[21] CPLM's counsel questioned Geller as to why he sought each category of documents identified in his counsel's initial letter seeking inspection of CPLM's documents. While Geller responded that he sought some of the categories of information on advice of counsel, he offered other reasons for seeking other categories of information. When asked why he sought the articles of incorporation and amendments thereto, he stated he wanted them, "[s]o I understand what's going on with the corporation of which I am a shareholder at the present time." When asked why he sought documents evidencing salaries, bonus distributions and profit allocation, he stated, "I believe, as I did when I was the president and chairman, in as much transparency as possible." When asked why he sought the general ledger, he replied, "To see if the organization is being run the way it should be by law, to have those books opened to the shareholders." When asked why he sought CPLM's tax returns, he responded, "To learn about the organization. To make sure the organization is following the rules that it states it's following."

---

[21]    Geller subsequently submitted an errata to his deposition transcript, purporting to change some of his answers. As to each of the answers in which he had testified that he sought CPLM's documents on advice of counsel, Geller changed the answer to read: "This letter was written by my lawyer and, as I understand it, was based on the recommendations of a certified public accountant. I am not an accountant and did not independently create this list and do not know specific reasons for the inclusion of each item except that I have been informed that I am entitled to this information. If the court grants me access to the financial information I intend to have it reviewed by an accountant who has the expertise to understand and analyze financial information that I, a physician, do not." The errata is unsigned. In any event, even if Geller's errata is disregarded, CPLM is mischaracterizing Geller's deposition testimony when it states, "his only answer was that his lawyer told him to do it."

We take particular note of the testimony regarding Geller's request for the list of shareholder names. At one point in his deposition, Geller was asked if he knew who the current shareholders were. He stated that he did, in fact, personally know them. He added that "if we took an hour," he could remember them all. He was then asked why he sought a list of shareholders and their ownership interests; Geller responded that he was advised by counsel that he was entitled to have that information. When CPLM's counsel then asked, "But why do you want it?" Geller responded with a lengthy explanation indicating that he had repeatedly reminded Dr. Amin to schedule shareholder meetings and provide financial reports, but had been rebuffed. When counsel again asked why Geller needed a list of shareholders, he stated, "Well, I don't know what they currently are." CPLM's counsel suggested that Geller had previously testified that he knew who the shareholders were. Geller explained that he knew the list of shareholders up through April 2006, but had not seen a list since.[22]

13.  *CPLM's Opposition to the Writ Petition*

On December 9, 2011, CPLM filed its opposition to the writ petition.[23] CPLM's opposition relied on three[24] points: (1) as of the date of the hearing, Geller will no

---

[22]   CPLM's counsel then stated that Geller was "changing [his] answer" as he had previously stated that he knew the shareholders. Geller attempted to explain that he misunderstood the earlier question, but his counsel directed him not to argue the point.

[23]   Because of the procedural history of this matter, in which an ex parte motion led to the setting of a hearing on an order to show cause why relief should not be granted, CPLM never actually filed an answer or other responsive pleading.

[24]   There was a fourth point raised, that Geller has announced that he is adverse to CPLM and will file a lawsuit. The evidence of this point consisted solely of

19

longer be a shareholder; (2) Geller could not specify a reasonable purpose for obtaining the information he sought; and (3) Geller has demonstrated that he "will disclose CPLM's internal issues" to Cedars, and there is "a real threat" that, if the petition is granted, Geller would disclose CPLM's confidential materials "in a vindictive effort to harm CPLM's relationship" with Cedars.

As to the first issue, that Geller will no longer be a shareholder as of the hearing on January 6, 2012, CPLM also argued, "Even if the hearing were held prior to January 1, 2012, [Geller] still does not have enough of an interest as a shareholder to require inspection because of his imminent status as a non-shareholder. The purpose of the inspection must be reasonably related to [his] interest as [a] shareholder."

As to the second issue, that Geller could not specify a reasonable purpose for obtaining the information, CPLM relied on Geller's deposition testimony. As we have discussed above, CPLM stated that Geller "was not able to state any legitimate reason for seeking the records. Indeed, his only answer was that his lawyer told him to do it." CPLM attached the entirety of Geller's deposition as an exhibit to its opposition, and, as we noted, it shows that Geller offered several reasons for seeking the information, which were not addressed in CPLM's opposition.

---

a declaration of CPLM's counsel stating that Geller "intends to file a claim against CPLM with the California Department of Fair Employment and Housing. On November 22, 2011, [Geller]'s counsel sent a letter to Dr. Amin at CPLM making a demand relating to [Geller]'s purported claims. That letter is not being attached because it was sent confidentially." Obviously this statement is hearsay. In any event, without knowing the nature of Geller's claims, it is impossible to determine whether Geller's request for CPLM documents in February 2011 was an attempt to improperly obtain evidence for his purported planned November 2011 complaint with the Department of Fair Employment and Housing.

As to the third issue, that Geller had disclosed CPLM's private information to Cedars and would do so again, vindictively, CPLM relied on a series of communications between Geller and individuals at Cedars regarding CPLM and Cedars's review of the department. CPLM argued that Geller "has shown that he will make erroneous and false disclosures to [Cedars] in order to pursue his misguided vendetta against Dr. Amin" and "has sent inflammatory emails containing defamatory statements that were intended to disrupt CPLM's business relationship with [Cedars]." While CPLM relied on the communications between Geller and individuals at Cedars, CPLM provided no factual evidence or legal argument demonstrating that any particular disclosures in Geller's e-mails were "erroneous and false" or "defamatory." It further provided no evidence that Geller's communications with Cedars were "intended to disrupt" CPLM's relationship with Cedars. To be sure, CPLM's management clearly believed Geller's communications were out of line and possibility detrimental to Cedars's opinion of Dr. Amin. But as to the issue of whether Geller's communications were *false* or made with the *intention* of disrupting CPLM's relationship with Cedars, CPLM provided no evidence beyond the communications themselves and some responses to them.[25]

---

[25] Moreover, there is very little in the way of authentication of the communications. That is to say, CPLM relies on a series of documents which were attached as exhibits to Geller's deposition. One of them, exhibit 9 to the deposition, is the e-mail Geller sent to a number of individuals in which he indicated that CPLM's act of urging its doctors to be positive when participating in the review of CPLM might constitute a violation of RICO. Yet there is no evidence as to whether any of the individuals who received this letter were not, in fact, members of CPLM with whom Geller was entitled to communicate about such matters. In his deposition, Geller was simply asked to admit

21

14. *Geller's Reply*

On December 16, 2011, Geller filed a reply in which he argued that CPLM "never had any intention of ever sharing the documents with Dr. Geller." He argued that CPLM intentionally delayed this matter until such time as it could terminate his employment, which would terminate his shareholder status.

Geller noted, however, that he was not required to sell his shares back to CPLM until 30 days after his employment terminated, so he would still be a shareholder at the time of the hearing on January 6, 2012.

15. *Geller's Ex Parte Application to Advance the Hearing*

On December 19, 2011, Geller gave notice of an ex parte application (to be heard on December 21, 2011) to advance the hearing to a date in December. Geller argued that, since CPLM had attempted to argue that Geller would lose his shareholder status at the end of December, it was critical that the hearing on the merits be held in December.

The trial court agreed to advance the matter to a December hearing date; however, since CPLM's opposition had relied on a January hearing date, CPLM would be entitled to file a supplemental opposition. CPLM could file its opposition on December 28, 2011, with the hearing to be held on December 30 (and any supplemental reply argument could be made at the hearing).

---

that exhibit 9 "is an e-mail that [he] wrote to a series of people." Other exhibits to the deposition on which CPLM relies, including numbers 10, 12, 13, 14, and 15, are not mentioned at all in Geller's deposition.

16. *CPLM's Supplemental Opposition*

CPLM filed a supplemental opposition, arguing that, at the time of the Friday, December 30, 2011 hearing, set for the afternoon session, Geller would have 3.5 business hours left as a shareholder. As a shareholder can only inspect financial documents if his purpose is reasonably related to his interests as a shareholder, CPLM argued that Geller's 3.5 business hours left as a shareholder could not possibly support a legitimate purpose to inspect the documents. Even if the court ordered inspection, Geller would not be a shareholder at the time the records could actually be produced.

In response to Geller's argument that he would, in fact, be a shareholder for another 30 days, CPLM noted that it "has opted to tender its repurchase on December 30, 2011 so that the repurchase becomes effective January 1, 2011." There was, however, no evidence submitted in support of this statement.

17. *The Hearing and Ruling on the Petition*

The hearing was conducted on December 30, 2011. Counsel for CPLM appeared by telephone, as he was on vacation in another state. At that time, the trial court issued its tentative ruling in favor of Geller, although limiting the categories of information he was entitled to inspect.[26] Geller made a brief argument for two additional categories of

---

[26] The court's tentative ruling was as follows on each of the categories of information sought by Geller: 1. A list of the shareholders and the ownership interest of each shareholder – granted; 2. Stock record book – denied; 3. Minutes of meetings of the Board of Directors, shareholder meetings and committee meeting minutes, including minutes of meetings of the compensation committee from January 1, 2007 to the present - denied; 4. Copy of articles of incorporation and any amendments thereto – denied; 5. A company organization chart – omitted from tentative ruling, but ultimately denied; 6. All shareholder agreements – denied; 7. Employment contracts for all doctors

23

information, which was denied.  Beyond that, the parties did not make any arguments regarding which information was required to be disclosed.

As to the issue of Geller's intent, the trial court explained that, "I found that [Geller]'s purpose is sufficient as required under the California Corporations Code and rejected [CPLM]'s contention that his intention is to harm the corporation."  The court also indicated, to CPLM's counsel, that the court would order the inspection forthwith "because I don't want it to become an issue two days from now when your contention is he is no longer a shareholder and no longer has these rights.  So, you're all welcome to negotiate something reasonable that allows you to return from vacation, an orderly inspection to take place.  If worse comes to worst, this has to be completed immediately."  The court repeated that it did not want anything to occur which gave rise to an argument that Geller lost his status as a shareholder, thereby invalidating the inspection order.

---

and all shareholders from Jan. 1, 2007 to the present – denied; 8. Year-end payroll report of compensation to all professionals for the years 2010, 2009, 2008 – granted; 9. W-2's and 1099 forms for shareholders and/or doctors for the years ending December 31, 2010, 2009, 2008 – granted; 10. Any and all schedules, computations and records that evidence the amount paid as salaries, bonus[es], distributions and or profit allocation to shareholders and/or doctors for the years 2010, 2009 and 2008 – granted, but limited to records maintained in the ordinary course of business which set out the information in the clearest and most efficient manner possible; 11. Any and all documents that evidence reimbursed expenses paid to shareholders and/or doctors for the years 2010, 2009 and 2008 – granted with the same limitation as category 10; 12. Any and all documents that evidence loans to shareholders and/or doctors for the years 2010, 2009 and 2008 – granted with the same limitation as category 10; 13. General ledger for the years ending 12/31/10, 12/31/09, 12/31/08 – granted; and 14. Federal and California Income tax returns for 2009, 2008 and 2007 – denied.

In response to CPLM's argument that 3.5 hours of shareholder status did not support a sufficient shareholder interest, the court explained, "Yeah, here's the problem. A more cynical reading of the facts of this case than I have been willing to enter into would suggest that your client has intended to and has, in fact, deprived the shareholder of his statutory rights through a very kind of inexplicably long response time. And I understand the parties hope[d] that an audit would have clarified these things, but the audit has been inexplicably delayed. So, at this point, while there are no cases, he had the right back in February, he agreed and participated in what I think we all thought to be a way to resolve the issues. That did not happen. [¶] I did not want his statutory rights to expire. He had a general and authentic and reasonable purpose, it continues to be his reasonable purpose and it doesn't get vitiated because, frankly, everybody tried to resolve this issue in another way, untimely, and that's what I'm left with."

The court also rejected CPLM's request for a confidentiality or non-disclosure order. The court stated that, given its rulings on each of Geller's specific requests, there was no need for a confidentiality order for the stockholder lists and financial information it was ordering CPLM to produce. The court specifically noted that Geller should have the right to stand up at a shareholders' meeting and discuss the matters he discovers in CPLM's financial documents.

The court stated that, although it was ordering the documents to be produced forthwith, it hoped the parties could work out an agreement to enable the inspection to occur without requiring CPLM's counsel to immediately return from vacation. CPLM's counsel proposed that the court, "[i]nclude in the order that we could have until next

Thursday or Friday to produce the records. And the mere fact that the production is happening after January 1st would not be asserted against Dr. Geller. Obviously, I have my arguments in terms of the fact that he only has three hours of— [interruption with a discussion of whether December 31 should be considered in Geller's time as a shareholder] – but the fact the production is occurring after January 1st, I would not hold this against him." Geller's counsel agreed.

The court adopted its tentative ruling, and noted that the parties had stipulated that the production would take place on January 6, 2012. The court's ruling noted, in a footnote, "As [Geller]'s termination will also terminate his status as a shareholder, it was necessary to advance the hearing to a date on which he still had standing to bring the writ. As set forth below, the fact of his impending loss of status as a shareholder also requires that the writ issued in this case shall be done immediately, without further notice or delay. Otherwise, defendant will gain from its own failure to perform its statutory obligations promptly."

18.    *CPLM Unilaterally Terminates Geller's Shareholder Status*

On December 30, 2011, the same day as the hearing, CPLM hand-delivered to Geller a letter buying back his stock. CPLM's letter acknowledged that its agreement with Geller required it to buy, and Geller to sell, Geller's shares within 30 days of the termination of his employment. CPLM sought to repurchase the shares immediately, and enclosed a check dated January 1, 2012, in the amount of the contractually agreed-upon purchase price. CPLM's letter stated that no stock certificates have ever been created or issued. As such, CPLM stated that "this letter serves as notice to you

26

that, as of 12:01 am Pacific Time on the date January 1, 2012, (i) CPLM will record the repurchase of your Shares on its books and records; (ii) you are deemed to have received consideration for repurchase of the Shares; [and] (iii) you no longer are a shareholder of CPLM . . . . '' There is no evidence that Geller negotiated the check or otherwise agreed to the repurchase of his shares taking place on January 1, 2012.[27]

19.    *Notice of Appeal and Petition for Writ of Supersedeas*

On January 3, 2012, CPLM filed a notice of appeal.  On January 4, 2012, CPLM filed with this court a petition for writ of supersedeas and sought an immediate stay of the order requiring production on January 6.  In its petition, CPLM stated, "Geller will suffer no prejudice from a stay.  Any rights he had to an inspection as of December 30, 2011 would be preserved pending appeal."  We granted an immediate stay on January 5, 2012, and ultimately granted the petition for writ of supersedeas.  As a result, the inspection has not occurred.

20.    *CPLM's Ex Parte Request to Allow Redaction*

On January 4, 2012, CPLM filed an ex parte application to protect third parties by allowing the redaction of personal identifying information in the documents to be inspected.[28]  Although CPLM had previously argued that the inspection should be

---

[27]    We are troubled by the idea that, when Geller was not *required* to sell his shares back for 30 days, CPLM could *unilaterally determine* that the resale would take place at 12:01 a.m. on January 1, 2012, simply because there were no physical share certificates to transfer.  It appears to us that Geller would have to either expressly or impliedly agree to yield his shareholder rights earlier than he was contractually obligated to do so.

[28]    The ex parte application also sought a stay pending appeal.  It was denied before CPLM filed its petition for writ of supersedeas.

limited by a confidentiality order or a non-disclosure agreement, CPLM had not previously sought to redact personal identifying information. In support of its application, CPLM offered the declarations of two of its doctors, who indicated that they did not want Dr. Geller or other CPLM shareholders to have access to their private information, including records relating to their compensation, bonuses, social security numbers, and other private data.

Geller opposed the ex parte motion, stating that he had "no objection to redacting personal identifying information, such as social security numbers, of the doctors. What Dr. Geller does object to, is redacting the identity of the doctors which would prevent him from learning which doctors were receiving what salary or other benefits . . . . This issue was fully discussed and fully litigated. To the extent CPLM is again seeking to 'redact' this information to prevent Dr. Geller from learning how CPLM has compensated its physician employees, this is nothing more than a motion for reconsideration improperly brought."

The ex parte motion was denied. The minute order indicates that it was called "off the record," and no reporter's transcript exists indicating the basis of the court's ruling.

21. *Judgment*

Over the following weeks, there was difficulty finalizing the judgment to reflect the intent of the court. Ultimately, the parties stipulated to the terms of a judgment,

28

which was filed February 16, 2012, nunc pro tunc as of January 5, 2012. CPLM filed a second notice of appeal, out of an abundance of caution.[29]

22. *Attorney Fees*

Corporations Code section 1604 provides that, in any action or proceeding to enforce a shareholder's inspection rights, "if the court finds the failure of the corporation to comply with a proper demand . . . was without justification, the court may award an amount sufficient to reimburse the shareholder . . . for the reasonable expenses incurred by such holder, including attorneys' fees, in connection with such action or proceeding." Geller sought his attorney fees under this provision, arguing that CPLM's refusal to comply was "without justification." Geller sought fees in the amount of $71,711.50.

CPLM opposed the request for fees on several bases.[30] First, CPLM argued that, since the trial court had denied Geller inspection of several of the categories of documents he had sought to inspect, CPLM's refusal to allow inspection had, in fact, been justified. As such, CPLM argued that Geller was not entitled to fees under the

---

[29]    While the judgment indicates that a writ "shall be entered," directing the inspection, it does not appear that a writ was ever issued.

[30]    CPLM's opposition to Geller's request for attorney fees, and its counsel's declaration in support thereof, are the documents in which CPLM mistakenly or falsely stated that: (1) Geller filed his petition without ever proposing alternative language for the confidentiality agreement (see fn. 7, *ante*); (2) at the November 8, 2011 status conference, the trial court told Geller he had "only himself to blame" for the delay (see fn. 20, *ante*); (3) Judge Chalfant vacated the May 12, 2011 order to show cause "as being improper" (see fn. 12, *ante*); and (4) that Geller testified at deposition "that he did not need [the shareholder list] since he knew all of the shareholders" (see fn. 22 and accompanying text, *ante*).

29

statute. Second, CPLM argued that, even if Geller were entitled to fees, he was entitled to only a fraction of the fees he sought ($11,741.50 or less). CPLM sought to reduce the fee award on the bases that Geller sought fees which (i) were not incurred in connection with this action; (ii) were the result of his improper and unnecessary litigation tactics; (iii) were inflated due to the fact that he changed counsel; and (iv) were incurred either before the petition was filed or while this action was stayed. CPLM also argued that (v) the fees awarded should be reduced due to Geller's partial success.

After a hearing in which the court took the matter under submission, the court issued an order awarding Geller $31,134.50 in attorney fees. The court concluded pre-litigation fees were "not warranted," and struck fee requests for six particular billing entries which were incurred in matters unconnected to the litigation. The trial court then reduced the remaining amount by half, on the basis that Geller was unsuccessful in obtaining half of the categories of documents he had sought.

CPLM filed a notice of appeal from the fee award. Geller filed a notice of cross-appeal from the same order.

## ISSUES RESOLVED ON APPEAL

We first discuss, and reject, CPLM's contention that this appeal is moot by virtue of Geller having lost shareholder status. Second, we conclude that Geller had a sufficient shareholder interest remaining at the time of the hearing to justify an inspection order. Third, we reject CPLM's contention that the judgment ordering inspection must be reversed to the extent that it violates the privacy rights of third parties. Fourth, we conclude the trial court did not err in making an award of attorney

30

fees in Geller's favor. Fifth, we reject CPLM's arguments that the fee award should have been further reduced for fees allegedly not incurred in connection with this proceeding and fees unreasonably incurred. Sixth, we reject Geller's contention that he should have been awarded pre-litigation fees. Seventh, we conclude the trial court erred in reducing the fees awarded by half due to Geller's partial success.

## *DISCUSSION*

1. *The Appeal Is Not Moot*

As we discuss below, we reject CPLM's argument that Geller did not have a sufficient shareholder interest on December 30, 2011, at the time of the hearing and the trial court's order that the inspection take place forthwith. To the extent that CPLM argues that, as a result of actions taken *after* that date, the appeal is moot, we disagree.

"An action becomes moot when ' "pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever . . . . " ' [Citation.]" (*Havlicek v. Coast-to-Coast Analytical Services, Inc.* (1995) 39 Cal.App.4th 1844, 1850.) "Changed circumstances render a matter moot only when they occur ' "without any fault of the defendant . . . . " ' [Citation.]" (*Ibid.*) When an inspection of corporate documents can no longer occur because of actions of the defendant, the defendant cannot rely on its own actions to defeat the inspection. (*Id*. at pp. 1850-1851 [defendant argued the case was moot as it had closed its California office and moved the documents out of state].) "This rule is

31

but a variation of the equitable maxim, '[n]o one can take advantage of his own wrong.' [Citation.]" (*Id*. at p. 1851.)

In this case, Geller's shareholder status was lost after the court ordered an immediate inspection of the documents due to actions of CPLM, specifically, its unilateral termination of Geller's employment and immediate repurchase of Geller's stock. As such, CPLM caused the changed circumstances, and cannot argue that the appeal is moot.

There is, however, a more important reason why CPLM will not be heard to argue that the matter is moot. At the December 30, 2011 hearing, the court ordered the inspection to occur forthwith, in order to prevent CPLM from arguing that Geller lost his standing if the inspection were to occur in January. CPLM *agreed* that if the inspection were delayed to January 6, 2012, it *would not raise the issue* that Geller lost standing. Prior to the inspection occurring on January 6, CPLM filed a notice of appeal and sought an immediate stay and writ of supersedeas from this court. In its petition for writ of supersedeas, CPLM specifically represented that Geller would "suffer no prejudice from a stay. Any rights he had to an inspection as of December 30, 2011 would be preserved pending appeal." In short, CPLM obtained a delay of the inspection to January 6, 2012 by representing to the trial court that it would not raise the issue that Geller lost his shareholder status on December 31, and it similarly obtained a writ of supersedeas from this court by representing the same thing. CPLM is therefore

estopped to argue that Geller lost his inspection rights when his shareholder status terminated.[31]

2.      *Geller's Shareholder Interest was Sufficient on December 30, 2011*

Corporations Code section 1600 provides a shareholder with an *absolute right* to inspect and copy the list of shareholders' names, addresses and shareholdings. Corporations Code section 1601, however, which provides the shareholder the right to inspect and copy the corporation's financial records, requires that the shareholder must seek to inspect the records "for a purpose reasonably related to such holder's interests as a shareholder." CPLM argues that, on December 30, 2011, when the hearing was held and the inspection ordered, Geller could not have had a purpose reasonably related to his interests as a shareholder, because his interests as a shareholder would expire in just a few hours.[32] We disagree.

Preliminarily, we address the standard of review. The parties agree that the issues relating to the interpretation of statutes raise questions of law to be reviewed de novo (*Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 913) and that questions

_____

[31]     CPLM relies on *Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 920-922, for the proposition that when a party seeking to inspect corporate documents loses standing pending appeal, the appeal is moot. However, as CPLM waived the right to challenge Geller's standing, it cannot now argue that the appeal is moot. In the next section, we address and reject CPLM's argument that, as of December 30, 2011, Geller did not have a sufficient shareholder interest to justify inspection.

[32]     CPLM does not argue that Geller lacked *standing* on December 30, 2011. As a shareholder, he clearly had standing under the statutes. CPLM argues, however, that Geller had no proper purpose due to the limited duration remaining to his shareholder status.

33

regarding whether a sufficient evidentiary showing was made are reviewed for substantial evidence (e.g., *Hartman v. Bandini Petroleum Co.* (1930) 107 Cal.App. 659, 661). However, CPLM argues that the issue can be resolved as a matter of law in its favor, and fails to address any of the evidence which could have supported the trial court's determination to the contrary.

There is little case authority setting forth a standard defining a "purpose reasonably related to [a shareholder's] interest as a shareholder." Under a prior statute,[33] it was held that the intent to see how the corporation was doing financially, to determine whether to invest further, was an acceptable motivation. (*Hartman v. Bandini Petroleum Co., supra,* 107 Cal.App. at pp. 660-661.) When a corporate director seeks inspection (under Corporations Code section 1602), the inspection may be denied when a disgruntled director announces his or her intention to violate his or her fiduciary duties to the corporation, such as by using inspection rights to learn trade secrets to compete with the corporation. (*Tritek Telecom, Inc. v. Superior Court* (2009) 169 Cal.App.4th 1385, 1390.)

The trial court concluded that Geller "had a general and authentic and reasonable purpose" for seeking the documents and expressly "rejected [CPLM]'s contention that his intention is to harm the corporation." Geller testified at his deposition that, as a shareholder, he wanted to see how the corporation was doing, and to make certain it was being run properly and complying with its obligations. CPLM argues that this is

---

[33] The prior statute allowed the corporation to deny inspection if the shareholder had the intent to use the information to the injury of the corporation. (Civil Code, fmr. § 377.)

not a proper purpose, in that there was so little time left to Geller's tenure as a shareholder, he would have been unable to act on any information he discovered by calling a shareholders' meeting. The point is irrelevant. Geller's purpose, to learn about the financial status of the corporation in which he was a shareholder, was proper. That he might not have been able to act on such knowledge[34] does not transform his purpose into an improper one.[35]

Moreover, we have serious doubts as to whether CPLM could, equitably, argue that Geller had too little time left as a shareholder for his purpose to be proper. As we have set forth at length above, the facts of this matter give rise to an inference that CPLM was responsible for the delay. Although the trial court, while ruling on the writ petition, did not specifically find that CPLM had acted in bad faith, the trial court expressly declined to allow CPLM to "gain from its own failure to perform its statutory obligations promptly."[36] Geller sought the financial information on February 16, 2011,

---

[34]    Even if Geller could not call a shareholders' meeting, Geller could still communicate any of his findings with current shareholders.

[35]    CPLM relies on *Capron v. Pacific Southwest Discount Corp.* (1935) 6 Cal.App.2d 436, 441, for its language that "[t]he 'purpose' referred to in the [shareholder inspection] statute is the purpose existing in the mind of the shareholder at the time of inspection of the records." The language is taken out of context. The *Capron* court was responding to an argument by the shareholder, who was charged by the corporation with seeking inspection for an improper purpose, that the corporation must also establish that the shareholder would carry out his improper purpose. The court responded that the focus is on the purpose itself, not on whether the shareholder "will succeed in accomplishing the purpose for which he demands" inspection. Thus, *Capron* supports, rather than undermines, Geller's right of inspection.

[36]    Moreover, the award of attorney fees implies a finding that CPLM's refusal to comply with Geller's demand was "without justification."

when he was, without doubt, a shareholder with a proper shareholder purpose. CPLM delayed for nearly two months, improperly demanding a confidentiality and non-disclosure agreement precluding Geller from sharing the information with other shareholders. Once Geller filed the action, CPLM delayed a hearing on the merits by baselessly questioning the legitimacy of Geller's purpose, and demanding his deposition on the issue. Before the deposition could take place, CPLM convinced Geller to stay the action, while it obtained an audit. In late September, 2011 (when, coincidentally, the audit should have been nearly completed), CPLM unilaterally chose not to renew Geller's employment contract. At a November status conference, when Geller sought to return the matter to calendar, CPLM argued to continue waiting for the audit, which it knew, at that time, might not be completed until January, after Geller's shareholder status would be terminated. When the agreed-upon hearing date of December 22, 2011 was unavailable, CPLM immediately requested a date in January, again knowing that it would argue that Geller no longer had standing. When Geller suggested that, under the terms of his agreement, he could remain a shareholder for 30 days after his employment was terminated, CPLM purported to unilaterally buy back its stock back at 12:01 a.m. on January 1, 2012. In short, if Geller's reasonable purpose was defeated by his minimal remaining shareholder status, it was due to CPLM's delaying the action while rushing to terminate Geller's status. The trial court concluded that CPLM should not be permitted to take advantage of this state of events. We agree. (Civ. Code, § 3517 ["No one can take advantage of his own wrong."])

Finally, we hold that Geller's purpose is *irrelevant* to his request for shareholder names, addresses and holdings. Geller had an absolute right to this information under Corporations Code section 1600. CPLM argues that Geller's right to obtain that information is "not at issue here for several reasons." First, CPLM notes that the right is only held by shareholders with at least a 5% holding; CPLM states that Geller did not prove he held at least 5% of the outstanding shares of CPLM. But Geller alleged that he owned such shares, CPLM never disputed the fact before the trial court, and CPLM, in fact, impliedly conceded it.[37] Second, CPLM states that Geller testified that he already knew the names and contact information for the shareholders, so the issue is moot. But, Geller testified at his deposition that he only knew the shareholders as of 2006, and that he did not know the current shareholders. Thus, there is substantial evidence that Geller did not know this information, and CPLM should have provided it.[38] Third, CPLM argues that "the remedy" for a refusal to disclose the shareholder list is to postpone the shareholders' meeting for a period equal to the delay in disclosure. The governing statute provides, however, that the right to postpone the shareholders' meeting "shall be in addition to any other legal or equitable remedies to which the shareholder may be

---

[37]     In its ex parte application to compel Geller's deposition, CPLM stated, that "Petitioner [Geller] – as a 5% shareholder of [CPLM]– filed an application to compel the inspection of" the documents. In any event, at Geller's deposition, he testified to a total of 15 shareholders of CPLM. He also testified that he believed all shareholders had equal ownership. As such, each shareholder, including Geller, held 6.67% of the outstanding shares.

[38]     In any event, a shareholder's right under Corporations Code section 1600 is absolute. There is nothing in the statute indicating that a shareholder, who believes he could recreate the shareholder list given sufficient time, thereby loses his right to request the list from the corporation.

entitled." (Corp. Code, § 1600, subd. (b).)  In sum, Geller was absolutely entitled to this information, regardless of the imminent lapse of his shareholder status, and the trial court did not err in ordering CPLM to provide it.

3.      *The Order Need Not be Modified to Protect Privacy Rights*

CPLM next argues that the trial court's order must be modified in order to protect the privacy of rights of third parties.  CPLM relies on the declarations of two of its doctors which indicated they had concerns regarding the disclosure of their private information to Geller.  But CPLM first raised the issue of third-party privacy rights by an ex parte motion after the trial court had already ordered production.  The record does not indicate the basis on which the trial court denied CPLM's ex parte motion, but the court would have been well within its discretion to deny the motion as an improper motion for reconsideration (Code Civ. Proc., § 1008) which was based on new facts, with no explanation as to why those facts were not brought to the attention of the trial court in a timely manner.  (*Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.)

4.      *The Trial Court Did Not Err in Awarding Geller Attorney Fees*

Corporations Code section 1604 provides that, in any action or proceeding under sections 1600 and 1601, "if the court finds the failure of the corporation to comply with a proper demand thereunder was without justification," the court may make an award of reasonable attorney fees "incurred . . . in connection with such action or proceeding." This statute grants a trial court discretion to award attorney fees to a shareholder when the corporation's "refusal to allow inspection was unjustified." (*Valtz v. Penta Investment Corp.* (1983) 139 Cal.App.3d 803, 810.)  CPLM argues that the award of

38

fees to Geller was not appropriate in that CPLM's refusal to allow inspection was justified. This is because, according to CPLM, it had justification for denying the demand because: (1) Geller's request was overbroad; and (2) CPLM was justified in refusing to comply until such time as Geller signed a confidentiality agreement.[39]

As to CPLM's overbreadth argument, we conclude that CPLM cannot pursue the challenge. CPLM argues that, since inspection was granted only with respect to *some* of the categories in Geller's counsel's initial inspection request, CPLM acted with justification in refusing to comply with the overbroad request. This argument would be persuasive *had CPLM complied with the remainder of the request.* That is to say, had CPLM immediately provided Geller with access to the shareholder list and the financial documents to which he was entitled, this litigation would have involved *only* categories of information to which CPLM did, in fact, have a justification for refusing to disclose. But CPLM did not do this. Instead, CPLM refused to provide even the documents which it knew were statutorily-required to be disclosed, in reliance on its demand for a non-disclosure agreement.[40] CPLM cannot be heard to argue that it was justified in

---

[39]     CPLM also argues that our issuance of a writ of supersedeas establishes the fact that the appeal raised "substantial questions" as to the correctness of the trial court's order. While we may have initially recognized that CPLM's appeal might well raise substantial questions, our complete review of the record makes it clear that CPLM acted entirely without justification, as the trial court found.

[40]     In fact, CPLM's counsel's initial correspondence with Geller's counsel suggested that, if Geller signed its proposed confidentiality agreement, CPLM would provide the documents it was statutorily required to provide. CPLM and Geller never reached the issue of *which* documents would be provided, because CPLM continued to demand a confidentiality agreement for even those documents it knew were within the scope of the disclosure statutes.

refusing to comply with the entire request, when it failed to comply with that portion of the request which was not overbroad.

We also conclude that the trial court did not err in finding that CPLM's refusal was well justified by its concerns regarding confidentiality. For *two months*, CPLM demanded that Geller execute a non-disclosure agreement which would have prevented him from disclosing the information to other shareholders, who, by statute, would have the same rights to review the financial information as Geller. Thereafter, CPLM agreed that Geller could share the information with other shareholders, but only if he obtained the other shareholders' signatures on the same non-disclosure agreement.[41] There is no justification for such an onerous condition.[42] CPLM argues that its confidentiality concerns regarding Geller were legitimate because of Geller's "improper purpose to disclose the records to harm CPLM," but the trial court rejected this characterization of Geller's purpose on the evidence.

5.    *There is No Basis for the Fee Award to be Further Reduced*

CPLM next contends that the attorney fee award must be further reduced because Geller's counsel's billing statements show unreasonable fees. Specifically, CPLM contends: (1) some of the fees awarded were not incurred in connection with the

---

[41]    Moreover, CPLM's employment agreement, presumably executed by all of the shareholders, *already provided* that CPLM's financial statements and financial data were considered proprietary information which could not be disclosed other than to CPLM's officers, directors, shareholders, physician-employees, or other authorized representatives.

[42]    Although CPLM represents that it subsequently offered to obtain the signatures of the other shareholders on its non-disclosure agreement, there is no evidence that it ever attempted to do so.

proceeding; (2) some of the fees awarded were the result of unreasonable and unsuccessful litigation conduct by Geller; (3) some of the fees awarded were inflated because Geller unnecessarily changed lawyers multiple times; and (4) some of the fees awarded were incurred before the petition was filed[43] or while the proceeding was stayed.

The trial court heard these arguments, reviewed the billing statements, and refused to award fees for six particular entries found to be unconnected with the present action. CPLM simply repeats its arguments on appeal and has failed to establish that the trial court abused its discretion in failing to further reduce the fees awarded.[44]

6.      *Geller Was Not Entitled to Pre-Litigation Fees*

Corporations Code section 1604 provides that the fees which may be awarded are those "incurred . . . in connection with [the] action or proceeding." Geller argues that he

---

[43]      The trial court agreed with CPLM on this point and declined to award pre-litigation fees.

[44]      In opposition to the attorney fee motion, CPLM copied Geller's counsel's billing records, and marked the great bulk of the entries with a number to indicate its objection. That is to say, fees labeled "1" were purportedly not incurred in connection with this proceeding; fees labeled "2" were purportedly incurred by Geller's unreasonable or unnecessary litigation conduct, and so forth. CPLM marked as "1" (not incurred in connection with this proceeding) numerous billing entries, after the start of this litigation, regarding further attempts to negotiate a confidentiality agreement. While, as we shall discuss, fees incurred in connection with *pre-litigation* attempts at resolution are not incurred "in connection with" the action so as to be included within the scope of an award under Corporations Code section 1604, attempts at resolution of a pending action are, in fact, occurred in connection with the action. The court did not err in awarding these fees. Similarly, CPLM marked as "2" (unreasonably or unnecessarily incurred) such obviously necessary fees as those incurred by the attorney who represented Geller at the hearing on the merits for time spent reading CPLM's opposition.

41

should be entitled to an award of his pre-litigation fees. The trial court interpreted the language of this statute as not permitting an award of pre-litigation fees, and we agree. The statute's plain language permits an award of fees incurred in connection with the action or proceeding. Had CPLM complied with Geller's initial request for documents, Geller would not have been entitled to any attorney fee award. Had CPLM and Geller amicably resolved the matter prior to litigation, Geller would similarly not be entitled to any fee award. Geller's entitlement to fees is based on the fact that he had to go to court to obtain the documents; he is entitled only to those fees incurred in connection with that action.

       7.      *Geller Was Entitled to an Award of All Fees Reasonably Incurred In Connection With the Action*

Finally, Geller argues that the trial court erred in reducing his fee award by 50% due to his partial success. That is to say, the court concluded that Geller was successful in seeking only approximately half of the documents he had sought, so awarded only half of the requested attorney fees.

Apart from whether it is legally permissible to allocate fees in this manner, we conclude there is no factual basis to do so in this case. It may be that a reduction in fees due to limited success is permissible when the parties actually litigated the issue of which categories of documents the shareholder was entitled to inspect. In this case, however, the issue was not litigated. It was never briefed by the parties and, with the exception of a brief argument taking up two pages of reporter's transcript, it was never argued before the trial court. The issue in this case was always *whether* Geller was

entitled to inspect documents at all, not *which* documents Geller was entitled to inspect. Geller was entirely successful on the issue actually litigated – he did, in fact, have a right to inspect documents, with no confidentiality restriction imposed.  As such, no fee reduction for lack of success was justified, and the trial court abused its discretion by cutting the fee award in half due to partial success.

       8.     *Geller is Entitled to an Award of Fees Incurred on Appeal*

Finally, a shareholder entitled to an award of attorney fees under Corporations Code section 1604 is entitled to fees incurred "at trial and on appeal."  (*Valtz v. Penta Investment Corp., supra,* 139 Cal.App.3d at p. 811.)  Geller is therefore entitled to recover his attorney fees incurred in this appeal.

## *DISPOSITION*

The judgment ordering inspection is affirmed. The order awarding attorney fees is reversed and the matter remanded with directions to the trial court to modify its fee award to eliminate any reduction based on Geller's partial success. In addition, the trial court is directed to consider and rule upon a motion for reasonable attorney fees incurred on appeal, should Geller seek such relief. Geller shall recover his costs on appeal.

*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, Acting P. J.

WE CONCUR:

KITCHING, J.

ALDRICH, J.